## KLEIN v. UNITED STATES.

## BURKE v. UNITED STATES.

### Nos. 13656, 13657.

United States Court of Appeals
Eighth Circuit.

July 21, 1949.

Rehearing Denied Aug. 15, 1949.
Writ of Certiorari Denied Nov. 7, 1949.
See 70 S.Ct. 145.

Ira B. McLaughlin, Independence, Mo., and Walter A. Raymond, Kansas City, Mo. (Will H. Hargus, Joseph Koralchik and Louis Wagner, Kansas City, Mo., on the brief), for appellants.

Richard K. Phelps and William A. Paisley, Special Assistants to the Attorney General (Alexander M. Campbell, Assistant Attorney General, on the brief), for appellee.

Before GARDNER, Chief Judge, and THOMAS and RIDDICK, Circuit Judges.

GARDNER, Chief Judge.

Appellants and three others were indicted upon a charge of conspiracy forbidden by Section 19 of the Criminal Code, Title 18, U.S.C., Sec. 51 [now 18 U.S.C.A. § 241], which, so far as here pertinent, reads as follows:

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same * * * they shall be fined not more than $5,000 and imprisoned not more than ten years, * * *."

The charged conspiracy embraced (1) obstructing, hindering and preventing lawfully qualified and registered voters from voting; (2) permitting and causing unqualified voters to vote in the name and place of duly qualified voters in order to deprive them of their rights, and (3) causing the officials of the election to record and count votes of unqualified persons who appeared at the polls and voted in the name and place of qualified registered voters. The election involved was a primary election held in Kansas City, Missouri, on August 6, 1946, to vote for candidates for nomination for members of Congress from said state. It was charged that the conspiracy was to be effected in the tenth precinct of the first ward of Kansas City, Missouri. We shall refer to the appellants as they were designated in the trial court.

Upon arraignment defendants interposed a motion to dismiss the indictment on the ground that it did not state facts sufficient to constitute an offense against the United States or the laws thereof. This motion was denied and all five defendants stood trial. At the conclusion of the Government's case two of the defendants were on motion granted judgments of acquittal. The jury convicted the other three defend-

ants but on motion in arrest of judgment the court arrested the judgment as to one of the other defendants but denied it as to the defendants here named.

A motion for a new trial having been denied, defendants prosecute these appeals, seeking reversal on substantially the following grounds: (1) the court erred in denying their motion for dismissal of the indictment because the statute involved does not apply to primary elections in Missouri; (2) the court erred in admitting in evidence the stamped voting records on the back of the registration affidavits in Exhibits 1 and 2, as proof that fraudulent votes were cast by impersonators of the registrants; (3) the court erred in admitting copies of parts of a poll book designated as Exhibit 6 and Exhibit 7; (4) the court erred in permitting the Government to offer evidence that voters were given assistance by the election judges without subscribing an oath in writing or taking an oral oath; (5) the court erred in admitting testimony of certain named witnesses as to alleged transactions for the reason that these transactions were res inter alios acta as to each defendant; (6) the court erred in refusing defendants' requested charge numbered 3; (7) the court erred in denying motions for judgment of acquittal of defendants.

The question of controlling importance is whether the party primary of August 6, 1946, was such an integral part of the subsequent general election of that year that the statute here invoked has any relevancy. It is argued that the Constitution secures only the right to vote in an election. Under the laws of Missouri the primary election is the only method by which one may receive the nomination of a political party. It is the initial step looking to the nomination of party candidates whose names are to be placed on the official ballot. Not only is this the only method provided by which one may receive the nomination of a political party, but it is the only method whereby the individual member of that political party may indicate his choice as between candidates. Its purpose manifestly was to give the same vitality to the constitutional guaranty of a free ballot in the choice of party candidates as in the choice of candidates on the final election. It was unknown to the common law but is a creature of statute. It is of comparatively modern origin, stemming, it is said, from a desire to correct supposed abuses in the old convention and caucus systems of nominating, and to give to electors direct control in the selection of their own candidates. There is some conflict in the decisions as to whether constitutional or statutory provisions relating to general elections apply to all classes of primary elections. The ultimate test has, we think, been determined by the Supreme Court in United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 1039, 85 L.Ed. 1368. The primary there involved was the Louisiana State Primary, where success in the primary was said to be tantamount to election so that the primary was in effect an election. In that case, however, the court did not rest its decision entirely upon the conclusive effect of the primary election. In the course of the opinion it is said,

"Where the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice, the right of the elector to have his ballot counted at the primary, is likewise included in the right protected by Article I, § 2. And this right of participation is protected just as is the right to vote at the election, where the primary is by law made an integral part of the election machinery, whether the voter exercises his right in a party primary which invariably, sometimes or never determines the ultimate choice of the representative."

In a later case, Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 763, 88 L.Ed. 987, 151 A.L.R. 1110, the Supreme Court, in speaking of the Classic case, said inter alia,

"By this decision the doubt as to whether or not such primaries were a part of 'elections' subject to Federal control, which had remained unanswered since Newberry v. United States, 256 U.S. 232, 41 S.Ct. 469, 65 L.Ed. 913, was erased. The Nixon cases [Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 769; Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed.

984, 88 A.L.R. 458] were decided under the equal protection clause of the Fourteenth Amendment without a determination of the status of the primary as a part of the electoral process. The exclusion of Negroes from the primaries by action of the State was held invalid under that Amendment. The fusing by the Classic case of the primary and general elections into a single instrumentality for choice of officers has a definite bearing on the permissibility under the Constitution of excluding Negroes from primaries."

Without minutely analyzing the various provisions of the Missouri primary election law, Mo.R.S.A. § 11546 et seq., it is to be observed that the statute provides that, "all candidates for elective offices shall be nominated by a primary election held in accordance with this article. * * *" The statute provides the time and place for holding primary elections, an official ballot at the primaries is provided for, its distribution is required, and the election expense is to be paid from the public treasury. Section 11569 of the Revised Statutes of Missouri, 1939, Mo.R.S.A., provides,

"The person receiving the greatest number of votes at a primary as the candidate of a party for an office shall be the candidate of that party for such office, and his name as such candidate shall be placed on the official ballot at the following election."

■ The result of the primary election is required to be published and certified to county clerks by the Secretary of State, and only the names of persons receiving the greatest number of votes at the primary as candidates of a party for office are placed on the official ballot. Judges and clerks of election are appointed just as in the case of general elections and the penalties and provisions of general election laws are made applicable to primaries. Under the primary system no one can be elected to office without receiving nomination at a primary election, except by petition as provided by Section 11534 of the Revised Statutes of Missouri 1939, Mo.R.S.A. One, however, may not become a nominee of a political party by petition. The primary law is a compulsory system and we think is an integral part of the general election laws of the state for the election of public officers, including Members of Congress. It is clear that the vote at the primary election determines the name of the candidate of a political party to appear on the ballot at the general election, and we think it follows that the right to vote at such a primary for the nomination of candidates for Congress, and to have the vote counted as cast, is a right secured by the Federal Constitution.

■ Over defendants' objection the court admitted in evidence Government's Exhibits 1 and 2, two books, the original and duplicate, being the record of qualified registered voters or registration record for the tenth precinct of the first ward, Kansas City, Missouri. Exhibit 1 is described as the original binder containing registration affidavits and the voting record stamped on the back thereof. These exhibits are original public records of a permanent nature. The objection interposed went "especially to that part thereof consisting of the voting records stamped or written on the back of the affidavits of the registration certificates." Under the law the voting record stamped on the back of the exhibits is required to be made by the election judges at the time the vote is cast. There was no request that the offer be limited in any way but the objection went to the entire offer for any and all purposes. Under the law of Missouri the Board of Election Commissioners is required to compare the voting record on registration affidavits with the poll books made contemporaneously with the voting for the purpose of comparison and correction and to insure accuracy of the voting record. Section 12139, Revised Statutes of Missouri 1939, Mo.R.S.A., provides that, "The judge having charge of the precinct register shall then, in a space prepared thereon, write or stamp the word 'voted' and the date of the election as in this article provided." These exhibits were identified by an officer of the Board of Election Commissioners. Being public records made contemporaneously with the events which they reflect, they are presumptively correct and are "writing or record * * * made as a memorandum or record of any act," within the meaning

of Title 28, U.S.C., § 695, [now 28 U.S. C.A. § 1732]; Harper v. United States, 8 Cir., 143 F.2d 795; Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719. The argument of counsel for defendants goes to the effect or weight of the evidence rather than to its admissibility. This was a public record as to who voted and who did not vote at the August 6, 1946, primary election. It might be impeached or its probative force impaired by the testimony of voters themselves or otherwise, and it is observed that the Government produced some thirty-six registered voters who testified that they did not vote although the record indicated that they had voted. This testimony was not as to mere attending circumstances but was an essential part of the Government's proof tending to show fraudulent voting and fraudulent conduct of the election. We think there was no error in admitting these exhibits.

■ It appears from the evidence that after the primary election in this tenth precinct, the poll books had been stolen. Prior to the time they had been stolen a witness representing the Kansas City Star testified that she had copied the names and addresses of all the voters listed in the poll book. This list was produced and identified as Exhibit 6 and was offered and received in evidence over the objection of defendants' counsel, it being stipulated that the poll books were not available. Another witness working for the Kansas City Star, who was formerly with the Board of Election Commissioners, explained the preparation of poll books and how they were delivered to the board at the end of the election day by precinct officers. He identified Exhibit 7 as a list which he checked against the poll books for this precinct to get poll line numbers. He secured the poll books from the chief clerk of the board. These were further rechecked by another witness and had, since the time of election, been preserved under lock and key until turned over to an F. B. I. Agent. As the poll books, if available, would have been admissible, it was proper to admit secondary evidence of their contents. The witnesses who made the copies were pro-

duced and subjected to cross-examination. Here, again, the objections urged go to the weight and probative force of the testimony rather than to its admissibility. We think the testimony was properly admitted. Hartzell v. United States, 8 Cir., 72 F.2d 569; McDonald v. United States, 8 Cir., 89 F.2d 128.

■ Defendants' requested instruction identified as number 25, which was to the effect that under the law of Missouri a qualified voter who declares under oath to the judges of election that he can not read nor write, or by reason of physical disability is unable to mark his ballot, is entitled to the aid of one of the judges and it is the duty of such judge to prepare the ballot for the voter as the voter shall declare his choice of candidates and that "the law of the State of Missouri does not require that the declaration under oath be made in writing." This request was marked as refused by the court. While it is true that the Missouri statute does not specifically provide that "the declaration under oath" be in writing, it does not provide that it need not be in writing and the Board of Election Commissioners is by statute authorized and directed "to make all necessary rules and regulations not inconsistent with this article, with reference to the registration of voters and the conduct of elections." Pursuant to this authorization the Board of Election Commissioners promulgated regulations requiring that voters asking for assistance should subscribe a written oath and the precinct officials were given printed instructions by the Board, which provided that any voters asking for assistance should subscribe a written oath on a form provided, which written oath should be returned with the ballots and election returns. The court instructed the jury that, "Under the charge here made the conspiracy constitutes the offense." Failure to comply with the regulation requiring the oath to be in writing was a circumstance which the jury might properly consider. The requested instruction singled out this item of evidence, thus giving undue emphasis to its importance to the exclusion of equally important facts and circumstances. There was no reversi-

ble error in denying the requested instruction.

By point number 5, defendants seek to assign error in admitting testimony of three named witnesses. These witnesses are referred to as "impersonators" who testified to having voted illegally, and it is urged that their testimony referred to transactions which were res inter alios acta as to defendants. The rule of this court which has reference to the contents of briefs provides, among other things, that, "If a point relates to the admission or exclusion of evidence, the statement shall quote the evidence referred to, and any objections or other equivalent action taken relative thereto, together with the rulings of the court thereon, giving the pages of the printed record on which the quotations appear." The point relied on does not state what questions were asked the witnesses, what objections, if any, were made, nor what the ruling of the court was on such objections. While we have searched the record, we do not feel impelled to discuss the questions sought to be raised further than to say that a wide discretion is vested in the trial judge in the admission of evidence in a conspiracy case. Walker v. United States, 8 Cir., 93 F.2d 383. We think there was no error in admitting the testimony.

Defendants' requested instruction number 3 was to the effect that there was no evidence that any of the defendants prevented or caused to be prevented divers legally qualified voters from voting, and that such charge in the indictment was withdrawn from the consideration of the jury. The giving of such an instruction would have been tantamount to granting a motion for judgment of acquittal and we think would have been an invasion of the province of the jury. It is argued that certain witnesses who testified with reference to having been prevented from voting were discredited, which, of course, is a question that could neither be decided by the trial court nor by this court. But these witnesses were not the only registered voters who were obstructed or prevented from merely obtaining a ballot and voting. It would unnecessarily prolong this opinion to analyze the testimony in this regard, but it conclusively appears that many other voters were obstructed and it appears that five or six voters at one time walked out of the voting booths when they were told they had been voted. We think it can not be said that there was no evidence that those who were prevented from voting were not qualified voters. A list of the qualified voters in the precinct was in evidence. The instruction was properly refused.

It remains to consider the contention of defendants that there was no substantial evidence that either defendant was a party to the conspiracy charged in the indictment. It is to be observed that the sufficiency of the evidence to establish the existence of the conspiracy charged is not challenged so that our inquiry is limited to a consideration of whether there was substantial evidence connecting the defendants with this conspiracy. The jury having found them guilty, that view of the evidence and of the inferences reasonably deducible therefrom must be accepted which is most favorable to the Government. Accepting as established the fact that there was a conspiracy to cause unqualified voters to vote at the primary election conducted in the tenth precinct of the first ward of Kansas City, Missouri, and deprive citizens of that precinct of their rights secured to them by the Constitution and the laws of the United States, as charged in the indictment, we need only refer to the evidence which tends to connect the defendants with the conspiracy as charged and proved. The proof as to the votes cast is limited largely to those cast for candidates on the Democratic ticket. There were three candidates for Congress on that ticket, Axtel, Slaughter and Walsh. According to the official count 259 votes were cast for Axtel, 19 votes for Slaughter and 8 votes for Walsh. Thirty-six qualified voters did not go to the polling place to vote, but nevertheless ballots were cast in their names by other persons, not qualified voters, and these spurious ballots were placed in the ballot box and counted. Twenty-three qualified legal voters who cast their ballots for members of Congress

testified that they voted for Slaughter as a candidate for Congress. Four other witnesses testified that they voted for Walsh. Six qualified voters appeared at the voting place and were informed that they had previously cast their ballot in said election. After they made protest to the judges of election and to the Board of Election Commissioners they were allowed to cast a ballot so that two votes were cast under their names and both ballots counted by the judges. The Government's evidence established that 43 voters were impersonated and that the 43 fraudulent ballots were counted. It was also proved that practically all of the fraudulent votes were cast for Axtel.

The trial court in its instructions, after reciting some of the undisputed facts and circumstances stated that,

"To bring about such a result would, in the natural course of events in the conduct of an election require the existence of a conspiracy, that is, joint action, and cooperation between two or more individuals. From the evidence in this case, it is a reasonable inference that some person must have determined and obtained the names of such qualified voters who they concluded were not going to vote in said election, and obtained some other persons to go into said precinct and cast ballots in the names of such legal voters. One person could not possibly, under the facts before you, have entered such polling place and voted 36 times. So from the very nature of the evidence, I believe you may legally infer that there was a conspiracy existing in connection with the election held in the 10th Precinct of the First Ward at said Primary."

 This conspiracy required the intervention of a human agency to bring about its unlawful purpose. We shall not detail the sordid story of the activities of these defendants in furtherance of this conspiracy. Klein was not only captain in name but was in command of these activities and Burke was his first lieutenant. The facts and attending circumstances detailed before the jury all point to the irresistible conclusion that these defendants, if they did not in fact create and organize the conspiracy, knew its purpose and actively participated in the furtherance of that purpose. Luteran v. United States, 8 Cir., 93 F.2d 395. It was to their efforts and activities that the amazing success of this conspiracy was due. It was through their unlawful acts that the voters as well as the candidates on the primary ticket were deprived of the rights guaranteed to them by the Constitution of the United States.

These defendants were ably defended in the trial court and were given a fair trial. We have searched the record with great care and are convinced that the court committed no prejudicial error in the trial of this case. The judgments appealed from are therefore

Affirmed.